UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

CARRIE L. JAMISON,          :
                            :
        Plaintiff           :   No. 4:11-CV-00725
                            :
    vs.                     :   (Complaint Filed 4/18/11)
                            :
MICHAEL ASTRUE,             :
COMMISSIONER OF SOCIAL      :   (Judge Munley)
SOCIAL SECURITY,            :
                            :
        Defendant           :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Carrie L. Jamison's claim for social security

disability insurance benefits and supplemental security income

benefits.

        On September 15, 2008, Jamison filed protectively[1] an

application for disability insurance benefits and an application

for supplemental security income benefits. Tr. 14, 141-146, 153

and 180.[2]  On December 3, 2008, the Bureau of Disability

---

1. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of her Answer on June 22,
2011.

Determination[3] denied Jamison's applications. Tr. 83-92.  On
December 9, 2008, Jamison requested a hearing before an
administrative law judge. Tr. 93-94.  After 12 months had passed,
a hearing before an administrative law judge was held on December
15, 2009. Tr. 27-65.  On February 9, 2010, the administrative law
judge issued a decision denying Jamison's applications. Tr. 14-20.
On March 9, 2010, Jamison requested that the Appeals Council
review the administrative law judge' decision and on February 25,
2011, the Appeals Council concluded that there was no basis upon
which to grant Jamison's request for review. Tr. 1-5 and 10.
Thus, the administrative law judge's decision stood as the final
decision of the Commissioner.

        Jamison then filed a complaint in this court on April
18, 2011.  Supporting and opposing briefs were submitted and the
appeal[4] became ripe for disposition on September 6, 2011, when
Jamison elected not to file a reply brief.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the

---

3. The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.  Tr. 84 and 89.

4. Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Jamison meets the insured status requirements of
the Social Security Act through December 31, 2012. Tr. 14, 16 and
180.

Supplemental security income is a federal income
supplement program funded by general tax revenues (not social
security taxes).  It is designed to help aged, blind or other
disabled individuals who have little or no income.

Jamison, who was born in the United States on September
25, 1964, graduated from high school in 1982 and can read, write,
speak and understand the English language and perform basic
mathematical functions. Tr. 35, 141, 170, 184 and 206.  During her
elementary and secondary schooling Jamison attended regular
education classes. Tr.190.  After graduating from high school she
attended college for 8 months to become a paralegal. Tr. 36 and
190.

Jamison held several jobs which can be considered past
relevant employment.[5]  A vocational expert testified that Jamison

---

5. Past relevant employment in the present case means work
performed by Jamison during the 15 years prior to the date her
claim for disability benefits was adjudicated by the
Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

has an employment history of semiskilled, medium to heavy work[6]

───────────────

6. The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work.* Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

as an office manager for a company that provided satellite installation; semiskilled, light work as an administrative clerk; unskilled, light work as a small parts assembler; and semiskilled, sedentary work as a receptionist. Tr. 19 and 56-57. Jamison also had work as a laundry attendant/housekeeper in a nursing home from March 24, 2008 to May 22, 2008,  and as a cashier from 1994 to 1995.[7] Tr. 194-195.

    Records of the Social Security Administration reveal that Jamison had earnings in the years 1980 through 1982, 1984 through 1986, 1988 through 1991, and 1994 through 2008. Tr. 154. No earnings were reported for the years 1983, 1987, 1992 and 1993. Id.  Jamison's annual income never exceeded $15,000.00 and there were only three years where her income exceeded $10,000.00: in 1997 she earned $14,460.07, in 1998 $14,697.40 and in 2006 $10,079.58. Id.  Jamison's total earnings were $116,653.14. Id.

    Jamison claims that she became disabled on September 2, 2008, because of degenerative disc disease of the neck and back;[8]

---

7. Both of these positions would be placed in the light work category.

8.    Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs.  The intervertebral discs, the soft cushions between the 24 bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and presses the annulus outward or ruptures the annulus. Such

---

bulges(protrusions) and herniations if they contact nerve tissue can cause pain.  Degenerative disc disease (discogenic disease) has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the facet joints is also a cause of localized lumbar pain that can be detected with plain x-ray testing is also a cause of localized lumbar pain.  The pain from degenerative disc disease of the spine is usually treated conservatively with intermittent heat, rest, rehabilitative exercises, and medications to relieve pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet.

spondylolisthesis of the cervical and lumbar spine;[9]  arthritis in

the neck, back and right hand;[10] carpal tunnel syndrome and

tendonitis in the right hand; pain in the hips and knees;

fibromyalgia; dyspepsia and gastrointestinal probles; and

depression. Tr. 185, 219, 230 She contends that she has constant

pain in her neck and back, constant stomach issues and headaches

everyday, and tingling in her right and left arm. Tr. 185.

On September 16, 2008, Jamison was interviewed face-to-

face by R. Slaughter, an employee of the Social Security

Administration, who observed that Jamison had no problem with

---

com/degenerativedisc/page2.htm (Last accessed May 24, 2012).
Degenerative disc disease is considered part of the normal aging
process. Id.

9. The word spondylolisthesis derives from two parts - spondylo
which means spine, and listhesis which means slippage. So, a
spondylolisthesis is a forward slip of one vertebra (i.e., one of
the 33 bones of the spinal column) relative to another.
Spondylolisthesis usually occurs towards the base of your spine
in the lumbar area. . . Spondylolisthesis can be described
according to its degree of severity. One commonly used
description grades spondylolisthesis, with grade 1 being least
advanced, and grade 5 being most advanced. The spondylolisthesis
is graded by measuring how much of a vertebral body has slipped
forward over the body beneath it." Spineuniverse.com,
Spondylolisthesis: Back Condition and Treatment, http://www.
spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-
back-condition-treatment (Last accessed May 23, 2012). Grad 1
spondylolithesis is where up to 25% of the vertebral body has
slipped forward over the vertebral body beneath it. Id. Symptoms
of this condition include pain in the lower back, pain and
weakness in one or both legs, and an altered gait. Id.  Some
people who have this condition exhibit no symptoms. Id.

10.  Jamison is right-handed. Tr. 208.

hearing, reading, breathing, understanding, coherency, concentrating, talking, answering questions, sitting, seeing, using hands and writing. Tr. 181-182.  Interviewer Slaughter did observe that Jamison had some problems with standing and walking. Slaughter noted that "[c]laimant was well prepared & helpful" but that "[s]he rose from her chair & walked slowly." Tr. 182.

Jamison on October 4, 2008, completed a 7-page document entitled "Function Report – Adult" in which she stated that she had no problem with personal care, including dressing, bathing, grooming and feeding herself. Tr. 204. Jamison indicated she prepares meals; washes dishes and does laundry; goes out everyday during the summer; drives a car; goes shopping; pays bills, counts change, and uses a saving account, checkbook and money orders; likes to read and watch TV; and does not need reminders to go places or someone to accompany her. Tr. 205-207.  Jamison indicated that she has no problem with following instructions, using hands, completing tasks, seeing, talking, hearing, reaching, and getting along with others. Tr. 208.  Jamison admitted that she could lift 20 pounds and sit for 3 to 4 hours and walk for 10 to 15 minutes. Id.  Jamison stated that she was "excellent" in following written instructions and "great" following spoken instructions "when repeated a few times.". Id.  James stated that she was "excellent" in getting along with authority figures. Tr. 209.  The document entitled "Function Report – Adult" was

8

completed by Jamison in legible, neat, crisp handwriting. There
are several documents in the record revealing Jamison's legible,
crisp handwriting. Tr.194-201, 203-214.  There is no indication in
any of these documents that Jamison wrote with an unsteady hand.

For the reasons set forth below we will affirm the
decision of the Commissioner denying Jamison's applications for
disability insurance benefits and supplemental security income
benefits.


**STANDARD OF REVIEW**

When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d
Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181
F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d
857, 858 (3d Cir. 1995).  However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if

we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence.");  Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176
(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

   Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

   Substantial evidence exists only "in relationship to
all the other evidence in the record," Cotter, 642 F.2d at 706,

and "must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971). A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence. Mason, 994
F.2d at 1064. The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707. Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole. Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which

he lives, or whether a specific job vacancy exists for
him, or whether he would be hired if he applied for
work.  For purposes of the preceding sentence (with
respect to any individual), "work which exists in the
national economy" means work which exists in
significant numbers either in the region where such
individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating disability insurance and supplemental security income

claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,

474 F.3d at 91-92.  This process requires the Commissioner to

consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity,[11] (2) has an impairment that is

severe or a combination of impairments that is severe,[12] (3) has

---

11. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

12. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

---

lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Jamison had not engaged in substantial gainful work activity since September 2, 2008, the alleged disability onset date. Tr. 16.

At step two of the sequential evaluation process, the administrative law judge found that Jamison had the following severe impairments: "degenerative disc disease, spondylosis, osteoarthritis of the spine, degenerative joint disease of the knees and fibromyalgia." Id.  The administrative law judge found that Jamison did not have a severe mental impairment or gastrointestinal disorder. Tr. 17.

At step three of the sequential evaluation process the administrative law judge found that Jamison's impairments did not individually or in combination meet or equal a listed impairment. Id.

At step four of the sequential evaluation process the administrative law judge found that Jamison could not perform her prior relevant work but that she had the residual functional capacity to engage in unskilled, sedentary work with a sit/stand option.  In so finding, the administrative law judge rejected the

14

conclusory opinion of Dow Brophy, M.D., one of Jamison's treating physicians, set forth on a Pennsylvania Department of Public Welfare form, that Jamison was temporarily disabled from May 22, 2008 until June 5, 2009. Tr. 307-308.  He also found that the opinion of Caroline Ditter, D.C., a treating chiropractor, was not inconsistent with an ability to perform sedentary work. Tr. 19 and 542-546. The administrative law judge further found that Jamison's statements concerning the intensity, persistence and limiting effects of symptoms were not credible to the extent they were inconsistent with an ability to perform a limited range of sedentary work. Tr. 18.

     At step five, the administrative law judge based on a residual functional capacity of a limited range of sedentary work as described above and the testimony of a vocational expert found that Jamison had the ability to perform unskilled, sedentary work as a receptionist/information clerk, an assembler, and a surveillance systems monitor, and that there were a significant number of such jobs in the local, state and national economies. Tr. 20 and 61-63.

     The administrative record in this case is 550 pages in length, primarily consisting of medical and vocational records. Jamison argues that the administrative law judge erred by rejecting the opinions of treating physicians, directing the vocational expert to assume Jamison was capable of full time work

15

despite the limitations set forth in the chiropractor's functional assessment, rejecting Jamison's testimony as not fully credible, and failing to find that Jamison had a severe mental impairment. Jamison also argues that she meets or equals Listing 1.04, Disorders of the Spine.

We have thoroughly reviewed the record in this case and find no merit in Jamison's arguments. The administrative law judge did an adequate job of reviewing Jamison's vocational history and medical records in his decision, and the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Tr. 14-20; Doc. 12, Brief of Defendant. Because the administrative law judge adequately reviewed the medical evidence in his decision we will only comment on a few items.

Initially we will note that the administrative law judge rejected the opinion of Dr. Brophy, Jamison's primary care physician.  Dr. Brophy in a conclusory fashion indicated that Jamison was temporarily disabled.  Dr. Brophy did not provide a detailed assessment of Jamison's functional abilities. We cannot conclude from Dr. Brophy's bare treatment notes that Jamison is unable to engage in the limited range of sedentary work set forth by the administrative law judge. Furthermore, since the disability onset date alleged by Jamison is September 2, 2008, the opinion of Dr. Brophy is unavailing because Dr. Brophy indicated that the

16

disability was only expected to last until June 5, 2009, a period of less than 12 months.

In addition, Dr. Brophy observed in August and September 2008 that Jamison had a normal spinal range of motion, normal extremities with full strength, and a normal neurological examination. Tr. 260 and 263.  In November 2008, Dr. Brophy found normal spinal range of motion, and no obvious instability; Jamison's extremities, hips, and knees were normal with intact motor strength and intact sensation. Tr. 323. In December, 2008, when Dr. Brophy completed the Department of Public Welfare form, Dr. Brophy indicated in medical notes that Jamison had a normal spinal range of motion and no obvious spinal instability, as well as normal extremities, hips and knees, intact motor strength, and grossly intact sensation. Tr. 320-321. Furthermore, at each of these appointments Dr. Brophy did not observe any abnormal psychiatric signs or symptoms.

During this time frame Jamison was also examined by David S. Mize, M.D., regarding abdominal pain. Tr. 280-285, 289-90 and 346-348.  Dr. Mize reported no muscle or joint pain, weakness, inflammation, motion restriction, atrophy or backache, or gross neurological deficits. Id.  He further observed that Jamison had appropriate affect, mood and judgment, and normal memory. Tr. 290 and 348.

A neurosurgeon, Vasantha Kumar, M.D., in May, 2009,

17

found that Jamison was not a surgical candidate. Tr. 390-391. On physical examination of Jamison, Dr. Kumar found that Jamison had full range of neck movement, normal strength in the upper and lower extremities, intact sensation and brisk reflexes. Id.  Dr. Kumar noted after reviewing the MRIs of the cervical and lumbar spine that "[t]hey both basically show some degenerative disc disease and on the cervical films there is some question whether she may have a very small 3 mm neuroma[15] at C7-T1 level [and] [i]n the lumbar area . . . basically [degenerative disc disease] at L5-S1 with 1 mm subluxation[16] and some facet arthropathy and also some degenerative changes in the upper part of the lumbar dics." Id.

      Also, on June 9, 2009, Jamison was examined by Mary C. Bush, M.D., regarding her pain complaints. Tr. 382-383. Dr. Bush's physical examination notes state in pertinent part as follows: "Ms. Jamison is a very pleasant 44-year-old woman, seated comfortably in a chair in the examination room in no acute distress. There are no obvious deficits in memory, speech, or cognition. Mood and affect are appropriate. Focused physical exam reveals tenderness with palpation over the lumbar facet joints.

15. Neuroma is defined as "a tumor growing from a nerve or made up largely of nerve cells and nerve fibers." Dorland's Illustrated Medical Dictionary, 1266 (32nd  Ed. 2012).

16. Subluxation is "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary, 1791 (32nd  Ed. 2012). Spondylolisthesis is another name for spinal subluxation.

Facet loading maneuvers are generally negative. There is some mild tenderness with palpation over the right SI joint. Evaluation for fibromyalgia reveals 11 out of 18 positive tender points with three negative test points, which does technically represent a positive physical examination for fibromyalgia. Gait is slightly antalgic. Otherwise, the patient's physical exam is generally unchanged or slightly improved since prior examinations." Tr. 382. Dr. Bush recommended that Jamison treat her condition with regular exercise and Tylenol as needed. Tr. 383. She also noted that physical therapy at "Rehab Options pain rehabilitation program" would be appropriate "for [her] fibromyalgia", that the x-rays of her knees were completely normal, and that "no additional diagnostic studies or physical therapy is indicated." Id.

As for the opinion of Dr. Brophy and the assessment of the chiropractor, the administrative law judge explained that he gave both opinions limited weight. Tr. 19.  Specifically, the administrative law judge stated as follows:

> [T]here is little explanation for the basis of [Dr. Brophy's] determination and the form is for purposes of eligibility for Department of Public Welfare benefits . . . As to the residual functional capacity provided by counsel from the chiropractor, as stated at the hearing . . .  such evidence is not from an acceptable medical source and is accorded limited weight. Even so, the vocational expert testified the jobs she identified could be performed within the general parameters of the residual functional capacity provided by the chiropractor.

Tr. 19 and 60-63.

19

The decision of the administrative law judge is supported by the opinion of the state agency psychologist, Joseph Kowalski, Psy.D., who found that Jamison did not have a severe mental impairment as well as by the "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" completed on October 10, 2008, by Dr. Mize. Tr. 277-278. Dr. Mize indicated that Jamison had no physical limitations. Id.

The administrative law judge appropriately considered the evidence, including the opinion of the state agency psychologist and Jamison's chiropractor. The administrative law judge's reliance on those opinions was appropriate. Cf. Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"). The administrative law judge appropriately took into account Jamison's limitations in the residual functional capacity assessment.

Jamison also argues that the administrative law judge erred at step three of the sequential evaluation process. Jamison contends that she meets listings under section 1.04, Disorders of the Spine.  Before we address the criteria/requirements of that listing we will mention some basic principles set forth in case law and the regulations of the Social Security Administration.  If Jamison's severe impairments

20

met or equaled a listed impairment, she would have been
considered disabled per se and awarded disability benefits.
However, a claimant has the burden of proving that his or her
severe impairment or impairments meet or equal a listed
impairment.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20
C.F.R. § 1520(d) and § 416.920(d).  To do this a claimant must
show that all of the criteria for a listing are met or equaled.
Id.  An impairment that meets or equals only some of the criteria
for a listed impairment is not sufficient. Id.

        The determination of whether a claimant meets or equals
a listing is a medical one.  Consequently, a claimant must
present medical evidence or opinion that his or her impairment
meets or equals a listing.  However, an administrative law judge
is not required to accept a physician's opinion when that opinion
is not supported by the objective medical evidence (raw data) in
the record. Maddox v. Heckler, 619 F. Supp.  930, 935-936
(D.C.Okl. 1984); Carolyn A. Kubitschek & Jon C. Dubin, Social
Security Disability Law and Procedure in Federal Courts, 250
(2011).

        To meet listings under section 1.04, a claimant must
have a disorder of the spine resulting in compromise of the nerve
root with 1) evidence of nerve root compromise characterized by
neuroanatomic distribution of pain, limitation of motion of the
spine, motor loss and a positive straight leg raise (if there is

21

lower back involvement), 2) confirmed spinal arachnoiditis, or 3)
lumbar spinal stenosis with pseudoclaudication, established by
imaging and manifested by chronic pain and weakness and resulting
in the inability to ambulate effectively.[17]  20 C.F.R. pt. 404,
subpt, P, app. 1, § 1.04.  Jamison fails to explain how she meets
the criteria of this listing.  Jamison admits that she did not
have positive straight leg raise tests.  She merely argues that
an MRI performed on September 15, 2008, evidences encroachment on
the spinal canal at C5-C6. Tr. 269.  However, that same MRI
states that there was no touching or compression of the spinal
cord. Id.  Furthermore, an MRI performed on March 26, 2009,
revealed "no spinal stenosis or disc herniation" and although
there were small disc spurs which projected into the spinal canal
at the C5/C6 and C6/C7 levels they did not contact or compress

---

17. The inability to ambulate effectively is defined at 1.00B2b as
follows:

> Inability to ambulate effectively means an
> extreme limitation of the ability to walk, i.e.,
> an impairment(s) that interferes very seriously
> with the individual's ability to independently
> initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as
> having insufficient lower extremity functioning
> . . . to permit independent ambulation without
> the use of handheld assistive device(s) that
> limits the functioning of both upper extremities.

22

the cervical cord.[18] Tr. 325.  Jamison did not present medical
evidence or opinion that she met or equaled all of the criteria
of a listed impairment.

        The administrative law judge observed Jamison testify
and determined that her statements concerning the intensity,
persistence and limiting effects of her symptoms were not credible
to the extent that they were inconsistent with the ability to
perform a limited range of unskilled, sedentary work. Tr. 18. The
administrative law judge was not required to accept Jamison's
claims regarding her physical and mental limitations. See Van Horn
v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that
credibility determinations as to a claimant's testimony regarding
the claimant's limitations are for the administrative law judge to
make).  It is well-established that "an [administrative law
judge's] findings based on the credibility of the applicant are to
be accorded great weight and deference, particularly since [the
administrative law judge] is charged with the duty of observing a
witness's demeanor . . . ."  Walters v. Commissioner of Social
Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v.
Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.
1991)("We defer to the ALJ as trier of fact, the individual

_____

18. This MRI also did not reveal spondylolisthesis in the cervical
spine. An MRI of the lumbar spine in November, 2008, did not
reveal any herniations, spondylolisthesis, or spinal stenosis. Tr.
326. It only revealed diffuse disc bulges at the L2/L3, L4/L5 and
L5/S1 levels "which [did] not appear to be significant." Id.

23

optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Jamison when she testified at the hearing on December 15, 2009, the administrative law judge is the one best suited to assess the credibility of Jamison.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge

Dated: May 25, 2012

24